COMPAGNIA ITALIANA TRASPORTO OLII MINERALI v. SUN OIL CO.

No. 331.

Circuit Court of Appeals, Second Circuit.

July 14, 1930.

684

See also 29 F.(2d) 744.

Stern & Ellenwood, of New York City (Ernest J. Ellenwood and George H. Abbott, both of New York City, of counsel), for appellant.

Duncan & Mount, of New York City, and Lamberton & Moffett, of Philadelphia, Pa. (John A. McManus, of New York City, R. E. Lamberton, of Philadelphia, Pa., and Kenneth R. Thompson, of New York City, of counsel), for respondent.

Before L. HAND, CHASE, and MACK, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff agreed to buy, and the defendant to sell, the tanker Sun, "after inspection on drydock at Chester, Pa.," to be made by "Lloyd's Classification Surveyor." The buyer's representative might be present, and "suggest anything he thinks should be done, but Lloyd's Surveyor to definitely determine what is to be done to continue the steamer in present class. Inspection to be made to determine if the vessel is in satisfactory condition to maintain her class in Lloyd's Register of Shipping, and, after being certified by the Lloyd's Register of Shipping that the vessel is in every respect in accordance with the Classification requirements, purchaser shall take acceptance of the vessel forthwith on the vessel being placed afloat by the seller * * * at Chester." The buyer was to bear the expense of docking; the seller had the right at its own expense to make such repairs as the inspection might disclose to be required to secure her classification, after which the buyer must accept.

The Sun was at sea at the time, and was to be delivered to be drydocked when she reached New York or Philadelphia. About a month later the buyer inquired by letter what deduction the seller would make if he accepted the vessel "free of survey in dry dock," to which the seller answered: "As this boat has but recently been drydocked and has passed a most exhaustive survey by Lloyd's, we do not anticipate having any expense on her bottom; in fact our people tell me that under the circumstances, there is no real purpose in docking the boat. We might, however, consider deducting, say $2,000, as the cutting out of this dry docking would save some expense in time if in nothing else." The buyer within ten days thereafter himself inspected the Sun, but could not see her bottom. The next day the parties met and the talk was as follows: The buyer then "wanted a reduction of $5,000" in the price as a rebate for giving up the survey. The seller "stated he could not allow the $5,000 because the vessel was in first class condition and it was able to maintain its class. In fact he reiterated what he said in that letter. * * * It was a waste of time to put the boat in dry dock because so much money was spent" on her. On the next day after a similar talk the seller agreed to knock $3,500 off the price, and the buyer to accept without drydocking. The evidence at the trial was that the Sun was in fact in extremely bad condition on delivery; her bottom being nearly through in many places. The buyer sued for breach of an implied warranty of reasonable fitness, and the court refused to take a verdict and dismissed the complaint for insufficiency in the proof.

The case turns upon the Sales Act, especially upon section 15 (section 96 of the

New York Personal Property Law [Consol. Laws N. Y. c. 41]), which defines implied warranties of quality. As to the original written contract, the buyer argues that he had made known "the particular purpose for which the goods" were "required," and that he relied "on the seller's skill or judgment." Both sides certainly knew that the Sun was to be used for carrying oil; indeed she was fit for nothing else. This was the "purpose" for which she was "required"; for it she must be "reasonably fit," if the buyer relied upon the seller's "judgment." As she was not so fit, the case turns altogether upon the question of reliance.

It is not enough that the buyer shall privately rely upon the seller's judgment; the seller must know that he is doing so, or the facts must charge him with such knowledge. A warranty is a term of the contract, and must be based upon mutual understanding. In the original contract at bar the buyer, so far as appears, did not consider the seller's judgment at all, nor was he even concerned with the fitness of the boat for her purpose. All he wanted was a tanker that could get classification, which he knew to depend on the judgment of the Lloyd's surveyor. He was satisfied that, if she could be classified, she would be fit enough for his purposes; or at any rate he agreed in that event to accept her. It is not therefore necessary to say that an implied warranty of reasonable fitness was "inconsistent" with the express condition of classification (section 15, subd. 6); we do not reach that question until we have some reason to infer that there was any implied warranty at all. Any such inference would be entirely gratuitous in a contract like this, where the parties selected such a different test of quality.

The modification was a complete change of face, for the buyer altogether eliminated classification. The seller is wrong in supposing that the contract could not be so modified by parol; he is equally wrong in thinking that there was no consideration for the abatement in price. He was no longer bound to repair up to the requirements of the Lloyd's surveyor, or lose his bargain. A new contract came into existence in which there might have been an implied warranty of fitness; that question we must decide. Just why the buyer offered to forego the survey does not appear, but at least the seller did nothing to induce it. That, however, is not conclusive, since though the buyer might have been willing to give up the inspection at some price, the actual price might have been fixed because of his reliance upon the seller. More-

over, it is possible to understand the seller's letter and his talk after the buyer's examination of the boat, as an assurance that there had been no substantial change in her since the "recent" survey. We do not say that this is true, but we may assume that as to that interval of time a jury might have found that the buyer took the seller's "judgment" and the seller knew it.

However, there is not the slightest justification for supposing that the buyer relied upon the seller to confirm the survey. Both parties were plainly treating on the assumption that surveys were the critical data for them. Whatever the survey showed needed no corroboration by the seller; the buyer was not relying upon him for its truth. Hence at best the buyer could have made a case under the modified contract only if he had shown that the damage took place between the survey and delivery. His proof showed nothing of the kind; indeed it showed that the damage could not have occurred in that interval. There was therefore nothing to submit to the jury.

We do not rely on the buyer's inspection on January 7th; he swore that he could not then see the bottom, where the damage was. Perhaps he could have done so before delivery, while the Sun was lying at Philadelphia; but it does not definitely so appear on this record. We reserve the question therefore whether under section 15 (subd. 3) an opportunity to inspect is equivalent to inspection. Possibly our decision in Job v. Heidritter, 255 F. 311, 3 A. L. R. 619, may go so far; Professor Williston seems so to incline (Williston on Sales, §§ 234, 248), but it is best not to go beyond this record. Nor need we decide whether a ship is "goods" within section one. (Section 82 of the N. Y. Personal Property Law.)

Judgment affirmed.